## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| **MONTY LEE HIGHTOWER**, *individually, and on behalf of all others similarly situated*, | |
| Plaintiff, | |
| **v.** | **Case No. 8:25-cv-02312-DKC** |
| **ALERTZPRO LLC**, | |
| Defendant. | |

### ALERTZPRO'S MEMORANDUM IN SUPPORT OF ITS
### MOTION TO STAY AND COMPEL ARBITRATION

Defendant AlertzPro LLC ("AlertzPro"), through counsel and pursuant to the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1, *et. seq.*, respectfully submits this memorandum in support of its motion to stay this case and compel arbitration, and states the following in support:

### I.    INTRODUCTION

Plaintiff Monty Lee Hightower alleges that he received unsolicited text messages from AlertzPro in violation of the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227(c)(5). While Plaintiff's TCPA claim is without merit, when he signed up to receive AlertzPro's messages on April 21, 2025 on The Class Action Guide's website, Plaintiff also explicitly agreed in the Terms and Conditions ("Terms") to arbitrate any claims he may have about AlertzPro's messages.

AlertzPro seeks an order staying this case and requiring Plaintiff to arbitrate his claims pursuant to the arbitration provision (the "Arbitration Agreement") in The Class Action Guide's Terms, which he agreed to twice on April 21, 2025. Pursuant to the Arbitration Agreement, Plaintiff agreed to arbitrate any dispute related to any emails, text messages or calls he received

from The Class Action Guide and its marketing partners, including AlertzPro, who was explicitly disclosed by name via the sign-up form that was captioned "Opt-In For Marketing Texts." The Arbitration Agreement also provides that questions of arbitrability, such as its enforceability and applicability to particular claims, shall be decided by the arbitrator. By the express terms of the Arbitration Agreement, this controversy must be resolved in arbitration instead of court.

Under the FAA, agreements to arbitrate are presumed to be valid and enforceable according to their terms. Indeed, the Supreme Court has repeatedly reaffirmed that the FAA strongly favors the validity and enforceability of arbitration agreements, and that the terms of such agreements must be vigorously enforced. *See Am. Express Co. v. Italian Colors Rest.*, 570 U.S. 228, 232-33 (2013); *see also Marmet Health Care Ctr., Inc. v. Brown*, 565 U.S. 530, 532 (2012); *CompuCredit Corp. v. Greenwood*, 565 U.S. 95, 98 (2012); *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 336 (2011). This line of precedent makes clear that arbitration agreements, like the Arbitration Agreement here, should be enforced as written. Thus, AlertzPro respectfully requests that the Court enter an order directing Plaintiff to arbitrate his claims on an individual basis pursuant to the terms of the Arbitration Agreement and staying this case until arbitration is complete.

## II.    FACTUAL BACKGROUND

### A.    Plaintiff's Agreement to The Class Action Guide's Terms and the Arbitration Agreement and Plaintiff's Consent to Receive Marketing Text Messages From AlertzPro

AlertzPro provides interested consumers with money-saving resources, both directly and via certain third party partners. *See* Declaration of Blaine Beichler ¶ 3, attached as **Exhibit 1**. The Class Action Guide helps consumers gain information about and access to class action settlements they are potentially entitled to, among other financial and savings opportunities, and

2

connects them with other financial resources available through its third-party marketing partners, like AlertzPro. *Id.* at ¶ 4. The Class Action Guide secures its website visitors' consent to receive its and its third-party marketers' emails and text messages, among other activities. *Id.*

Here, on April 21, 2025, Plaintiff visited The Class Action Guide's website, and was presented with the following screen. *Id.* at ¶ 9, 29. There, he entered his email address (montyhightower2@gmail.com), and clicked "Act Now." *Id.*



By doing so, Plaintiff agreed to The Class Action Guide's Terms, and consented to receive communications from The Class Action Guide, its "affiliated companies, and unaffiliated third parties." *Id.* at ¶¶ 10, 29. He was likewise explicitly informed in that one-sentence clause that the blue-hyperlinked Terms he was agreeing to "require[] arbitration," which he could read in full by simply clicking the blue-hyperlinked "Terms and Conditions" phrase. *Id.* at ¶¶ 9, 14.

After clicking "Act Now" to signify that "I agree to [] the Terms," Plaintiff proceeded to click through four additional pages and voluntarily entered the following information:

(i) His first name: Monty;

(ii) His last name: Hightower;

(iii) His city and state of residence: Mobile, AL;

(iv) His zip code: 36695;

(v) His date of birth: XX/XX/1950; and

(vi) His phone number: (850) 866-XXXX.

*See* Beichler Decl. ¶ 30; *cf.* Compl. (ECF No. 1) ¶¶ 5, 7 (Plaintiff resides in Mobile, Alabama, and his phone number begins with "850-866").

On the final page, Plaintiff was presented with a screen captioned "**Opt-In For Marketing Texts**" that contained the personal information he had just provided in the preceding screen. *Id*. at ¶ 17. As pictured below, the bottom of this page included text right below where his phone number would have appeared and right above the green box soliciting his assent to the language "I consent to be texted as described above." *Id.* at ¶ 17-18. That language begins with "AGREEMENT TO BE CONTACTED AND ARBITRATE: By checking the box below and selecting continue," and confirms that by his checking the box and then pressing "Continue," Plaintiff consented to receive texts from, among others, Unified Marketing Partners LLC or "one of its subsidiaries" at the phone number he had entered. *Id*. at ¶ 18. The word "subsidiaries," in blue hyperlinked text as shown below, leads to a list of Unified Marketing Partners LLC's subsidiaries – in which AlertzPro is listed in the top row. *Id.* at ¶ 19.



On the first page of The Class Action Guide's Terms, which were hyperlinked on each page of this agreement process that Plaintiff completed, *see* Beichler Decl. ¶ 21, Plaintiff was again advised that the Terms contained a class-action waiver, and evidenced his agreement to arbitrate any and all claims he had relating to him signing up for this site's services, including communications received as a result. *Id.* at ¶ 23 (citing Beichler Decl. Ex. A). Furthermore, the Dispute Resolution Section began with a bold-lettered notice to Plaintiff that this section "affects [his] rights, including [his] right to file a lawsuit in court," and that "there is no judge or jury in arbitration, and discovery procedures and appellate rights are more limited than in court." *Id.* at 24. Finally, in the substantive portion of the Dispute Resolution Section, the Terms stated:

> This agreement applies to any "Dispute" between (a) you, and (b) us and/or **our advertisers marketing partners, or clients, which you agree are third-party beneficiaries of these Dispute Resolution Provisions** (Company, its parent, subsidiaries, affiliates, and their advertisers, **marketing partners**, and clients, and each of their respective officers, directors, employees, agents, shareholders, licensors, suppliers and/or attorneys) are all included within the term "Company"

for purposes of these Dispute Resolution Provisions) related to the Website or Offerings **including, without limitation, or any calls, texts or emails you may receive in conjunction with your interactions with the Website or any Offerings or other interactions with us.** "Dispute" means any dispute, claim, or controversy (excluding those exceptions listed below) between you and Company, whether based in contract, tort, statute, fraud, misrepresentation, or any other legal theory, for which either of us seeks legal recourse, including the validity, enforceability, or scope of this agreement to arbitrate or any portion of it. **Questions of arbitrability—for example, whether a Dispute falls within the scope of this arbitration agreement and whether this arbitration agreement is enforceable—shall be decided by the arbitrator.**

For the avoidance of doubt and without limiting the foregoing, **you agree to arbitrate any dispute related to any emails, text messages or calls you may receive from us or from any third party in conjunction with your interactions with our Website or with us**, regardless of whether such dispute is with us or with the third party.

*See* Beichler Decl. ¶ 25; *id.* Ex. A at 7 (emphasis added).

Despite voluntarily entering all of his own personal information and clicking "Act Now" and "Continue" on two separate pages, thereby agreeing to The Class Action Guide's Terms and Arbitration Agreement on April 21, 2025, Plaintiff has filed this putative class action lawsuit instead of arbitrating his individual claim against AlertzPro.

### B.  Plaintiff's Allegations Against AlertzPro

Plaintiff filed his Complaint on June 13, 2025. Despite consenting to receive AlertzPro's text messages *and* voluntarily entering his personal information, Plaintiff alleges that he received "at least twenty-four text [] messages" from AlertzPro for which he allegedly did not give "prior express consent or permission." Compl. ¶¶ 15, 20. He also alleges that the telephone number he voluntarily provided was registered on the National Do Not Call Registry ("NDNCR") when he received the text messages from AlertzPro. *Id*. at ¶ 14.  Plaintiff asserts one claim, an alleged

6

violation of 47 C.F.R. § 64.1200(c), for which he claims a private right of action under 47 U.S.C. § 227(c)(5) ("TCPA"). *Id.* at ¶¶ 2, 58.[1]

## III.    LEGAL STANDARD

Courts in the Fourth Circuit treat motions to compel arbitration as Federal Rule of Civil Procedure 12(b)(3) motions. *See Aggarao v. MOL Ship Mgmt. Co., Ltd.*, 675 F.3d 355, 365 n.9 (4th Cir. 2012) ("The Supreme Court has characterized an arbitration clause as a specialized kind of forum-selection clause. . . . In particular, the Court has deemed foreign arbitration clauses to be a subset of foreign forum selection clauses. . . . A motion to dismiss based on a forum-selection clause should be properly treated under Rule 12(b)(3) as a motion to dismiss on the basis of improper venue.") (citation modified); *see also Kirkwood v. Fin. W. Inv. Grp., Inc.*, Civil Action No. CCB-17-2005, 2019 U.S. Dist. LEXIS 172376, at *4 (D. Md. Oct. 3, 2019) ("The United States Supreme Court has identified arbitration agreements as a specialized kind of forum-selection clause that posits not only the situs of suit but also the procedure to be used in resolving the dispute. . . . A motion to dismiss based on a forum-selection clause should be properly treated under Rule 12(b)(3) as a motion to dismiss on the basis of improper venue. . . . Thus, motions to compel arbitration may properly be treated as motions to dismiss for improper venue pursuant to [Rule] 12(b)(3).") (citation modified). "On a motion to dismiss under Rule

---

[1] While this is an issue for the arbitrator, Plaintiff fails to state a claim under Subsection 227(c)(5) because his suit is only about text messages, not the "telephone calls" for which Congress created a private right of action. *See, e.g.*, *Davis v. CVS Pharmacy, Inc.*, No. 4:24-cv-477-AW-MAF, 2025 U.S. Dist. LEXIS 167366, at *3, *9 (N.D. Fla. Aug. 26, 2025) (acknowledging that "no ordinary person would think of a text message as a 'telephone call,'" and holding that to "succeed on his § 227(c)(5) [claim], Davis had to allege that he received at least two 'telephone calls.' He alleged receiving only text messages. And because text messages are not telephone calls, he has not stated a claim."); *see also Jones v. Blackstone Med. Servs., LLC*, No. 1:24-cv-01074-JEH-RLH, 2025 U.S. Dist. LEXIS 138371, at *9-10 (C.D. Ill. July 21, 2025) ("the Court agrees . . . that based on a plain reading of the TCPA and its implementing regulations, Section 227(c)(5) does not apply to text messages.").

12(b)(3), the court is permitted to consider evidence outside the pleadings." *Id.* (quoting *Aggarao*, 675 F.3d at 365-66).

"To compel arbitration, a court must find that an arbitration agreement exists between two parties and that the dispute at issue falls within the scope of the agreement." *Mawing v. PNGI Charles Town Gaming, L.L.C.*, 426 Fed. Appx. 198, 199 (4th Cir. 2011) (citing *Hightower v. GMRI, Inc.*, 272 F.3d 239, 242 (4th Cir. 2001)). When deciding "whether an arbitration agreement encompasses a dispute a court must determine whether the factual allegations underlying the claim are within the scope of the arbitration clause[.]" *Id.* (quoting *J.J. Ryan & Sons, Inc. v. Rhone Poulenc Textile, S.A.*, 863 F.2d 315, 319 (4th Cir. 1988)). If there are "any ambiguities regarding the scope of [the] arbitration clause[,] [they] should be resolved in favor of arbitration." *Id.* (citing *Wachovia Bank, Nat'l Ass'n v. Schmidt*, 445 F.3d 762, 767 (4th Cir. 2006)); *see also Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 626 (1985) ("Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]").

Finally, when determining whether a court may order a party to arbitrate even if it is not a signatory to the arbitration agreement, courts apply "traditional principles" of the State's contract law governing the agreement. *See Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009). These principles include "incorporation by reference, **third-party beneficiary theories**, waiver and estoppel." *Id.* (emphasis added) (citation omitted). Under New York law, "an arbitration agreement may be enforced in favor of third-party beneficiaries." *Castillo v. Altice USA, Inc*., Case No. 1:23-cv-05040 (JLR), 2023 U.S. Dist. LEXIS 224924, at *14 (S.D.N.Y. Dec. 14, 2023) (quoting *Gerszberg v. Li & Fung (Trading) Ltd.*, 215 F. Supp. 3d 282, 288 (S.D.N.Y. 2016)); *see also Elliott v. Leatherstocking Corp.*, 3:10-cv-934, 2011 U.S. Dist. LEXIS 40722, at *34

(N.D.N.Y. Apr. 14, 2011) ("Under New York law, a contractual promise can be enforced by a non-party who is an intended third-party beneficiary of that promise." (quoting *Consolidated Edison, Inc. v. Northeast Utilities,* 426 F.3d 524, 527 (2d Cir. 2005))). An entity is a third-party beneficiary to a contract when there exists "a valid and binding contract between other parties, [and] the contract was intended for" the third party's benefit. *Id.* (quoting *Mendel v. Henry Phipps Plaza West, Inc.*, 6 N.Y.3d 783, 784 (2006)). "The touchstone of third-party beneficiary status is the intent of the parties to the agreement." *In re Generali COVID-19 Travel Ins. Litig.*, 577 F. Supp. 3d 284, 292 (S.D.N.Y. 2021) (citation omitted); *see also Hines v. 1025 Fifth Ave., Inc.*, 14 Civ. 3661 (SAS), 2015 U.S. Dist. LEXIS 21497, at *5-6 (S.D.N.Y. Feb. 23, 2015) (An individual is a third-party beneficiary to a contract where "the parties to the contract intended to confer a benefit on the third-party[.]" (citation omitted)).

## IV.    ARGUMENT

### A. The Court Should Issue an Order Compelling Arbitration.

The FAA provides that

> [a] party aggrieved by the alleged failure . . . of another to arbitrate under a written agreement for arbitration may petition any United States district court which, save for such agreement, would have jurisdiction . . . of the subject matter of a suit arising out of the controversy between the parties, for an order directing that such arbitration proceed in the manner provided for in such agreement.

9 U.S.C. § 4. Section 2 of the FAA mandates that binding arbitration agreements in contracts "evidencing a transaction involving commerce. . . shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. This provision "reflect[s] both a 'liberal federal policy favoring arbitration' and the 'fundamental principle that arbitration is a matter of contract,'" such that "courts must place arbitration agreements on an equal footing with other contracts and enforce them according to

9

their terms." *AT&T Mobility*, 563 U.S. at 339 (citation modified); *see also Buckeye Check Cashing, Inc. v. Cardegna*, 546 U.S. 440, 443 (2006) ("Section 2 [of the FAA] embodies the national policy favoring arbitration and places arbitration agreements on equal footing with all other contracts[.]").[2] "[Q]uestions of arbitrability must be addressed with a healthy regard for the federal policy favoring arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24 (1983); *see also Perry v. Thomas*, 482 U.S. 483, 490 (1987) (arbitration agreements falling within the scope of the FAA "must be 'rigorously enforce[d]'") (citations omitted). Again, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]" *Moses H. Cone Mem'l Hosp.*, 460 U.S. at 24-25.

This Court should issue an order compelling arbitration because: (i) the Arbitration Agreement is a valid, enforceable agreement between AlertzPro and Plaintiff to submit disputes to binding arbitration, (ii) AlertzPro is a named third-party beneficiary to the Arbitration Agreement; and (iii) this case is a controversy between Plaintiff and AlertzPro that is subject to the Arbitration Agreement.

**B. Plaintiff's Agreement to The Class Action Guide's Terms and Arbitration Agreement is Valid Under New York Law.**

An arbitration agreement governed by the FAA, like the Arbitration Agreement here, is presumed to be valid and enforceable. *See Shearson/Am. Express v. McMahon*, 482 U.S. 220, 226 (1987); *see also Mitsubishi Motors Corp.*, 473 U.S. at 626-27. The Arbitration Agreement at issue here is valid under applicable law and, thus, must be enforced as written.

---

[2] The Supreme Court has made clear that the FAA applies to any transaction directly or indirectly affecting interstate commerce. *See, e.g.*, *Citizens Bank v. Alafabco, Inc.*, 539 U.S. 52, 56 (2003); *see also Allied-Bruce Terminix Cos. Inc. v. Dobson*, 513 U.S. 265, 277 (1995). There is no question that the activities at issue here involve interstate commerce. Plaintiff is an Alabama resident, Compl. ¶ 5, while AlertzPro is a Maryland LLC. *Id.* ¶ 6.

The Class Action Guide's Terms, which Plaintiff agreed to and which includes the Arbitration Agreement, is expressly governed by New York law. *See* Beichler Decl., Ex. A at 6. Thus, while the FAA governs the enforceability of the Arbitration Agreement, New York law governs whether a valid agreement to arbitrate exists. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995) ("When deciding whether the parties agreed to arbitrate a certain matter (including arbitrability), courts generally . . . should apply ordinary state-law principles that govern the formation of contracts.").

The Class Action Guide's Terms, including the Arbitration Agreement, and Plaintiff's agreement to the Terms, are valid under New York law because Plaintiff (i) had constructive notice of the Terms and (ii) manifested his assent to them when he voluntarily entered his information, clicked the "Act Now" button manifesting his agreement to the Terms, and then clicked the "Continue" icon, once again stating he agreed to the Terms. *See Zachman v. Hudson Valley Fed. Credit Union*, 49 F. 4th 95, 102 (2d Cir. 2022) (To form a contract under New York law, there must be "a meeting of the minds and a manifestation of mutual assent.") (citation omitted).

Under New York law, an offeree is bound by contractual terms of which he or she has actual or inquiry notice and "assents to them through conduct that a reasonable person would understand to constitute assent." *Id*. (citation omitted). Courts look to whether the contract terms were "obvious and whether [they were] called to the offeree's attention" to determine whether the offeree was "on inquiry notice of [the] contract terms[.]" *Id*. (citation omitted). Those contract law principles apply to "online transactions." *Id*.

A "clickwrap" agreement is a common type of agreement that companies use for obtaining consumer agreement to their online terms of service. *See Sollinger v. SmileDirectClub,*

11

*LLC*, 19-CV-5977 (JPO), 2020 U.S. Dist. LEXIS 27168, at *5 (S.D.N.Y. Feb. 18, 2020) (citation

omitted). As part of a "clickwrap" agreement, a website "user must click 'I agree,' [or similar

language,] but not necessarily view the contract to which []he is assenting." *Id*. (citation

omitted); *see also Zachman*, 49 F. 4th at 103 ("We have consistently upheld [clickwrap

agreements] because the user has affirmatively assented to the terms of the agreement by

clicking 'I agree' or similar language."). "[C]lickwrap agreements are valid and enforceable

contracts" under New York law. *Sollinger*, 2020 U.S. Dist. LEXIS 27168, at *5  (quoting *Whitt

v. Prosper Funding LLC*, No. 15-CV-136, 2015 U.S. Dist. LEXIS 91413, at *9 (S.D.N.Y. July

14, 2015)); *see also Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 75 (2d Cir. 2017) (noting that

"'[c]ourts around the country have recognized that [an] electronic 'click' can suffice to signify

the acceptance of a contract,' and that '[t]here is nothing automatically offensive about such

agreements, as long as the layout and language of the site give the user reasonable notice that a

click will manifest assent to an agreement.'" (quoting *Sgouros v. TransUnion Corp.*, 817 F.3d

1029, 1033-34 (7th Cir. 2016))).

Here, The Class Action Guide's process for having Plaintiff agree to its Terms online is

an enforceable type of clickwrap agreement. When agreeing to The Class Action Guide's Terms,

Plaintiff had to affirmatively assent to the terms of the agreement by entering his email and

clicking "Act Now." Beichler Decl. ¶ 5, 14.  The text showing his agreement to the Terms was

brief, and the Terms themselves were prominently distinguished in blue, hyperlinked text. And,

as shown above, he affirmatively assented to the Terms a second time after entering further

personal information, checking a box next to text that read "I consent to be texted as described

above,"[3] and clicking "Continue." In both instances where Plaintiff assented to the Terms, The Class Action Guide's Terms could be accessed by clicking a blue hyperlinked "Terms" link – which in the first instance was contained in a clear and conspicuous space directly between where he entered his email and where Plaintiff clicked "Act Now," and in the second instance was located at the bottom of the page, with that location explicitly identified in the short paragraph he was agreeing to when Plaintiff checked the box and then clicked "Continue." *Id.* ¶ 17. The Terms provided explicit notice of the Arbitration Agreement in the first paragraph on the first page. *Id.* Ex. A at 1.

The agreement language above "Act Now" clearly put Plaintiff on notice of The Class Action Guide's Terms, and flagged that they "require[] arbitration," and that by "clicking the button below" (i.e., "Act Now"), he was agreeing to them. The agreement language above "Continue" on the final page gave Plaintiff additional notice of The Class Action Guide's Terms and a reminder that they "require arbitration." Plaintiff manifested his assent to The Class Action Guide's Terms by entering his email and clicking "Act Now." He again manifested his assent by entering further personal information and clicking "Continue" on the final opt-in page.

The Class Action Guide's process for acquiring Plaintiff's agreement to its Terms is similar to—and clearer than—many other online agreements that have been enforced by the Second Circuit and New York courts. *See, e.g, Meyers*, 868 F.3d at 74, 76, 80 (holding the plaintiff "unambiguously manifested his assent to Uber's Terms of Service as a matter of California law (noting "that New York and California apply substantially similar rules for determining whether the parties have mutually assented to a contract term"),  by clicking "a

---

[3] If Plaintiff had *not* checked the box stating that he consented to receive text messages, and merely clicked "Continue," The Class Action Guide would not have provided AlertzPro with his contact information. *See* Beichler Decl. ¶ 20.

button marked 'Register,' underneath which the screen state[d] 'By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY,' with hyperlinks to the Terms of Service and Privacy Policy."); *Hamm v. Capsule Corp.*, 22-cv-05435 (JSR), 2022 U.S. Dist. LEXIS 173613, at *3-11 (S.D.N.Y. Sept. 26, 2022) (holding the defendant's terms "were reasonably conspicuous and" the plaintiff "agreed to them" where the plaintiff assented to the defendant's terms by entering her "email address and clicking a 'CONTINUE' button, immediately below which Capsule display[ed] the message: 'By clicking continue, I accept the Capsule Terms of Service, Privacy Policy, and HIPAA Policy.'").[4] This Court should likewise find that the Terms Plaintiff agreed to here are an enforceable and binding contract.

### C. AlertzPro is a Third-Party Beneficiary to The Class Action Guide's Terms and Arbitration Agreement Under New York Law.

AlertzPro is entitled to enforce the Arbitration Agreement here. *See Arthur Andersen LLP*, 556 U.S. at 631. "[T]raditional principles" of state law allow a contract to be enforced by or against nonparties to the contract through "incorporation by reference, **third-party beneficiary theories**, waiver and estoppel[.]" *Id.* (emphasis added). Because The Class Action Guide's Terms contain a choice-of-law provision, *see* Beichler Decl. Ex. A, this Court should apply New

---

[4] *See also Whitt*, 2015 U.S. Dist. LEXIS 91413, at *9-10 (finding a clickwrap agreement that required the plaintiff "to click a box adjacent to the bolded text '**Clicking the box below constitutes your acceptance of** . . . the borrower registration agreement,' where the term 'borrower registration agreement' was conspicuously rendered as a hyperlink to the Agreement itself[,]" placed the plaintiff "at least [on] constructive knowledge of the terms of the Agreement and that he assented to those terms. Thus [the defendant] [] demonstrated that [the plaintiff] accepted the terms of the Agreement, including its arbitration provision[.]"); *see also Brodsky v. Match.com LLC*, No. 09 Civ. 5328(NRB), 2009 U.S. Dist. LEXIS 101167 (S.D.N.Y. 2009) (enforcing a forum selection clause the plaintiff agreed to on Match.com's website by checking "a box on the website affirming 'I agree to the Match.com terms of use,' which statement [wa]s hyperlinked to a complete copy of the 11-page User Agreement."); *Eslworldwide.com, Inc. v. Interland, Inc.*, No. 06 CV 2503 (LBS), 2006 U.S. Dist. LEXIS 41935, at *4 (S.D.N.Y. June 21, 2006) (finding that plaintiff was bound to a forum selection clause where the text above a clickable "Accept" icon stated that, by clicking it, a user was bound to the terms of service which included the forum selection clause).

York contract law to assess AlertzPro's status as a third-party beneficiary to the Terms and its Arbitration Agreement. *See Durham v. Airbnb, Inc*., No. SAG-24-02523, 2025 U.S. Dist. LEXIS 37936 (D. Md. Mar. 3, 2025) (applying California law due to a choice-of-law provision in the contract containing the arbitration agreement).

Under New York law, an entity is a third-party beneficiary to a contract when (1) "a valid and binding contract [exists] between other parties, [(2)] that [] contract was intended for [the entity's] benefit and [(3)] [] the benefit to [it] is sufficiently immediate[.]" *Elliot*, 2011 U.S. Dist. LEXIS 40722, at *34 (quoting *Mendel,* 6 N.Y.3d at 784). Further, "[t]he touchstone of third-party beneficiary status is the intent of the parties to the agreement." *In re Generali COVID-19 Travel Ins. Litig.*, 577 F. Supp. 3d at 292 (citation omitted); *see also Hines*, 2015 U.S. Dist. LEXIS 21497, at *5-6 (An individual is a third-party beneficiary to a contract where "the parties to the contract intended to confer a benefit on the third party[.]" (citation omitted)).

The Arbitration Agreement expressly states that disputes between a signatory and The Class Action Guide's "advertisers[s], marketing partners, or clients" are subject to binding arbitration, no matter whether the claims are brought against The Class Action guide directly or one of its marketing partners. *See* Beichler Decl. Ex. A at 7. Indeed, the Terms include an explicit statement that such additional parties are "third-party beneficiaries" of the contract. *Id.* AlertzPro is a named marketing partner and client of The Class Action Guide, as evidenced both by the attestation of its Head of Operations and Sales, *see* Beichler Decl. ¶¶ 2-5, and by the fact that it was expressly named in the list of entities from whom Plaintiff consented to receive text messages when agreeing to The Class Action Guide's Terms and data-sharing. *Id.* at ¶ 19. Where a party is explicitly incorporated into the terms of a binding arbitration clause, it is a third-party beneficiary to the agreement under New York law. *See Curtis v. JPMorgan Chase Bank, N.A.*,

2024 U.S. Dist. LEXIS 14684, at *20 (S.D.N.Y. Jan. 25, 2024) (finding that where an arbitration provision applied to claims against the signatory and its "parent, subsidiaries, affiliates, [and] licensees," the agreement "expressly ma[d]e [the affiliate] a third-party beneficiary," even though the affiliate was not expressly named). Indeed, the "identity of a third-party beneficiary need not be set forth in the contract or, for that matter, even be known as of the time of its execution." *MK West Street Co. v. Meridien Hotels, Inc.*, 584 N.Y.S.2d 310, 312 (N.Y. App. Div. 1992) (citation omitted). Instead, the third-party beneficiary must simply be one of "a class of persons intended to be benefited." *981 Third Ave. Corp. v. Beltramini*, 485 N.Y.S.2d 535, 538 (N.Y. App. Div. 1985). As AlertzPro is a named marketing partner of The Class Action Guide, *see* Beichler Decl. ¶ 4, it is a third-party beneficiary to the Term's Arbitration Agreement under New York law, and may enforce the terms of the Arbitration Agreement agreed to by Plaintiff.

### D. Plaintiff's Claims Fall Squarely Within the Scope of The Arbitration Agreement.

Where, as here, the parties have a valid arbitration agreement, an "order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT&T Tech., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986). "Any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]" *Mitsubishi Motors*, 473 U.S. at 626. Where the arbitration clause is broad, there is a heightened presumption of arbitrability: "[in] the absence of any express provision excluding a particular grievance from arbitration, . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail." *AT&T Tech.*, 475 U.S. at 650 (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 584-85 (1960)).

The Arbitration Agreement here broadly encompasses disputes between the Plaintiff and The Class Action Guide's "advertisers[s], **marketing partners**, or clients… **related to the** [Class Action Guide] Website or **Offerings including, without limitation, any calls, texts or emails [Plaintiff] may receive in conjunction with [his] interactions with the Website or any Offerings** or other interactions with [them]." *See* Beichler Decl. Ex. A at 7 (emphasis added). Plaintiff's relates solely to his alleged receipt of marketing text messages from AlertzPro, *see* Compl. ¶¶ 15, 19, which AlertzPro only sent promptly after receiving notice of Plaintiff's completion of The Class Action's Guide's opt-in process. *See* Beichler Decl. ¶¶ 29-31. Thus, Plaintiff's claims fall squarely within the Arbitration Agreement.

### E.    The Action Must be Stayed Pending Arbitration.

Section 3 of the FAA expressly provides that, where a valid arbitration agreement requires a dispute to be submitted to binding arbitration, the district court "shall . . . stay the trial of the action until such arbitration has been had in accordance with the terms of the agreement[.]" 9 U.S.C. § 3. Indeed, "[w]hen § 3 says that a court 'shall . . . stay' the proceeding, the court must do so." *Smith v. Spizzirri¸* 601 U.S. 472, 476 (2024); *id.* at 478 ("When a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding."). Because Plaintiff must be compelled to arbitrate his claim against AlertzPro, the action should be stayed pending completion of arbitration.

## V.    CONCLUSION

Given Plaintiff's clear assent to The Class Action Guide's Arbitration Agreement, to which AlertzPro is a third-party beneficiary, the Court should grant this Motion, order Plaintiff to arbitrate his dispute, and stay the action pending completion of arbitration.

Dated: September 5, 2025                    Respectfully submitted,

                                           ALERTZPRO, LLC

                                           By Counsel

                                           /s/ Joseph P. Bowser
                                            ROTH JACKSON
                                           1519 Summit Ave., Suite 102
                                           Richmond, VA 23230
                                           Telephone:      (804) 441-8701
                                           Facsimile:      (804) 441-8438
                                           Email:    jbowser@rothjackson.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 5th day of September, 2025, a copy of the foregoing document was served via this Court's Electronic Case Filing (ECF) system upon:

John Thomas McGowan, Jr.
Kinner & McGowan PLLC
413 E Capitol St SE
Washington, DC 20003
Phone: 901-351-6776
Email: jtmcgowan@gmail.com


Anthony I. Paronich
Paronich Law PC
350 Lincoln St. Ste. 2400
Hingham, MA 02043
Phone: 615-485-0018
Email: anthony@paronichlaw.com

*Counsel for Plaintiff*


/s/ *Joseph P. Bowser*
Joseph P. Bowser